UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 15-10055-CIV-GOODMAN

[CONSENT CASE]

ELLEN FOX and
CARRIE THORNTON,

  Plaintiffs,

v.

SUNSET WAVERUNNER TOURS, INC.,

  Defendant.

_____/

## ORDER ON SUMMARY JUDGMENT MOTIONS

In April 2013, Defendant Sunset Waverunner Tours, Inc. ("Sunset Tours") rented a personal watercraft ("PWC") to Plaintiffs Ellen Fox and Carrie Thornton in Key West, Florida. With her mother, Ellen Fox, on board as a passenger, Thornton drove the PWC into mangroves shortly after leaving the PWC tour's starting point. They both suffered injuries and were air-evacuated from Key West to Jackson Memorial Hospital in Miami. Alleging that Thornton had no prior experience operating a PWC, the mother and daughter Plaintiffs filed this two-count lawsuit against Sunset Tours. Count I is for negligence and Count II is for violation of Florida Statute § 327.54, which applies to liveries and establishes safety regulations and criminal penalties for a violation. [ECF No. 20].

Sunset Tours filed a summary judgment motion. [ECF No. 40]. The motion is based on a release of liability form contained in the applicable rental contract.

Plaintiffs filed their own summary judgment motion. [ECF No. 41]. Plaintiffs contend that Sunset Tours violated Florida Statute § 327.54 and Florida Administrative Code ("FAC") 68D-36.107, which Plaintiffs contend means that Sunset Tours was negligent per se, which further means that the release is invalid. Plaintiffs contend that a party cannot exempt itself from tort liability if the release would exempt it from liability arising from a failure to comply with a safety statute. Sunset Tours, however, contends that it *did* provide adequate instructions to Plaintiffs before they departed on their PWC tour -- and fully complied with Florida Statute § 327.54.

In addition, the applicable law is that a ship which collides with a stationary object and is at the time in violation of a safety rule designed to prevent this type of collision then assumes the burden of showing the violation could not have been the cause.

So, by way of procedural summary, the issue of whether Sunset Tours violated the safety statute and related regulation is at the heart of both summary judgment motions. If Sunset Tours complied with the statute and related regulation, then the release may well be valid (even though Plaintiffs assert other arguments about the release's enforceability). If Sunset Tours violated the statute and related regulation, then the release is invalid. And if Sunset Tours violated the statute and related regulation,

2

then it is under a burden to show that the violation could not have caused the collision with the mangroves. Thus, resolving the competing summary judgment motions depends, in large part, on whether Sunset Tours complied with the statute and administrative rule.

Because there is a genuine factual dispute about Sunset Tours' compliance with (or violation of) the statute and related administrative code provision, the Undersigned **denies** both summary judgment motions.

## Factual Background

The parties agree that the PWC collision occurred in the Salt Run Channel in Key West, Florida on April 3, 2013. They also agree that the two Plaintiffs (and other family members) rented Yamaha WaveRunners from Sunset Tours. And they agree that WaveRunners are classified as personal watercraft under Florida law and federal regulation. They likewise agree that the WaveRunner is a "vessel" within the meaning of 1 U.S.C. § 3 and that the collision between the WaveRunner and the mangroves occurred upon the navigable waters of the United States, within the territorial limits of the State of Florida.

Plaintiffs voluntarily signed the rental contract, which contains a release of Sunset Tours from all liability. The paragraph title of "release" was in all capital letters, in a bold font that was larger than the remainder of the text.

Curtis Lemon, a Sunset Tours employee, was working the check-in booth and arranged for Plaintiffs and their family members to sign the Bar Boat Lease Rental Contract and PWC Renter Orientation Checklist. Plaintiffs contend that Lemon did not provide any training or instruction beyond directing them to look at the documents and ask if they had questions; Sunset Tours disputes this and points to Lemon's deposition, where he said that he also explains to customers "what they're going to be filling out" and then fits them with a life jacket. [ECF No. 52-6, pp. 16-17]. Lemon also said, in his deposition, that "[w]e go over all that in a safety briefing on the dock," but it is not clear whether the "we" reference includes Lemon himself. [ECF No. 52-6, p. 20].

Plaintiffs contend that Lemon did not assess the Plaintiffs' ability to safely operate the WaveRunner. Sunset Tours objects, but the objection does not actually and directly dispute the contention. Instead, Sunset Tours contends that Lemon asked Plaintiffs to thoroughly read the checklist before signing it and before paying for the tour and then asked if they had any questions.

After the paperwork was completed, Plaintiffs moved to the floating dock where the WaveRunners were stored, and another Sunset Tours employee, Chase Coleman, passed out life jackets, made each person put one on, selected a WaveRunner and gave a safety speech.

It is undisputed that Coleman does not remember the specific words he used in the safety speech he gave that day to Plaintiffs and that he follows a protocol which includes the specific topics covered in the safety speech.

It is also undisputed that Coleman confirmed that Plaintiffs were first-timers -- i.e., they had never ridden PWCs before. Coleman told them "no worries," but Sunset Tours notes that he usually gives first-time riders more attention during the rest of the safety instructions on the dock.

Coleman's safety speech was a standard one, covering the operation of the WaveRunner, safety procedures (including hand signals, speed, guidelines for following the tour guide, the kill-switch lanyard, the need to throttle in order to steer, and how to reboard if they fell off). He told them that WaveRunners are unstable at low speed, oscillate and feel squirrely.

Thornton heard the instructions but did not ask any questions before taking full control of the WaveRunner and operating it.

After the safety speech was completed, Coleman pushed each rented WaveRunner off of, and away from, the dock, stern first. Each PWC then proceeded north in the Salt Run Channel toward the open water.

There is some dispute over the specifics of how Thornton accelerated down the channel. Plaintiffs contend that the WaveRunner was wobbly and that Thornton's biggest concern was to even it out (i.e., stabilize it). Plaintiffs say Thornton accelerated

to full throttle in an effort to bring the PWC up onto plane with the weight of her mother on the rear. Sunset Tours focuses on Thornton's deposition testimony, where she said she did not perceive anything wrong or out of the ordinary. In addition, Sunset Tours emphasizes that Thornton said she was going full throttle as soon as she headed away from the dock, "making it impossible for her to later accelerate to full throttle to even out." But Thornton's deposition testimony was that she "*probably* pushed it *almost* all the way down" and then she confirmed that she hit the throttle "full gas." [ECF No. 52-9, pp. 57-58] (emphasis added).

According to Plaintiffs' Statement of Undisputed Facts, Thornton proceeded down the channel and the WaveRunner began to veer to the right. They say she continued to hold the throttle open and turn the steering wheel to the left in an effort to correct the veer to the right. They say the PWC "did not respond to the steering input" and the WaveRunner then crashed into the mangroves that line the channel. But Sunset Tours disputes this. It points to Thornton's deposition, where she testified that she held the throttle down with the gas open as soon as she left the dock and got pushed into the channel. She said the "young" employee who gave the safety instructions on the dock told her to hold down the throttle all the time. She testified that she and her mother were "having a blast, going really fast" before the PWC started turning to the right.

In addition, Sunset Tours notes that Lemon drove the WaveRunner back to the dock, without any problems, after he pulled it from the mangroves. [ECF No. 52-6, p.

99]. It also points out that the specific WaveRunner was used again after the collision with the mangroves [ECF No. 52-6, pp. 99-100].

The parties agree that Thornton and Fox were injured when the WaveRunner collided with the mangroves.

Plaintiffs contend there is no evidence that Coleman completed a qualified boater safety course, a requirement. They note that Sunset Tours produced boater training safety cards for the other two employees, but not for Coleman. Sunset Tours does not challenge its inability to produce a card for Coleman, but it argues that Coleman unequivocally testified in his deposition that he obtained his boater's safety card and captain's license. But the captain's license was obtained in 2016, after the 2013 collision at issue in this case.

Sunset Tours submitted an affidavit from Coleman, who said he attended and completed a boater's safety course provided by the American Safety Council on March 21, 2013 (a little more than two weeks before the collision) and therefore "successfully completed a boater safety course approved by the National Association of State Boating Law Administrators and State of Florida." [ECF No. 52-10]. The affidavit also explained that he lost the boater's safety card and therefore could not provide it to defense counsel. [*Id.*].

Plaintiffs say there is no dispute that no employee of Sunset Tours presented them with a copy of the owner's manual for the Yamaha WaveRunner they rented and

they further state that no employee discussed its contents. Defendant challenges this. Although Sunset Tours does not claim that an employee actually gave Plaintiffs the manual, it contends that the Yamaha placard was visible on the PWC and lists warning and safety hazards. Moreover, it contends that the checklist signed by Plaintiffs "contains the same information that is listed in the manual."

The three-page "PWC Renter Orientation Checklist" lists 39 separate paragraphs of warnings, each one separately initialed by Plaintiffs. [ECF No. 52-5]. Some of the 39 paragraphs contain several points. The checklist contains the following advice: "Do Not Release Throttle when Trying to Steer" as "you need throttle to steer," "Take Early Action to Avoid Collisions" because "PWC's and other boats do not have brakes," "Operate Defensively" and "Operate at safe speeds," "Keep a safe distance away from people, objects and other boats (including PWCs)," "Avoid Aggressive Maneuvers" and "Ride within your limits and avoid aggressive maneuvers to reduce the risk of loss of control, ejection and collision."

Plaintiffs contend that no Sunset Tours employee expressed a familiarity with the owner's manual. Sunset Tours objects to this statement, though it does not expressly contend that the point is disputed. Instead, it notes that it was part of the employees' protocol to ensure that its employees were familiar with the Checklist (which contained "many" of the instructions and warnings found in the owner's manual) and safety speech.

Plaintiffs' list of purportedly undisputed facts claims that Sunset Tours employees "failed to go over multiple issues which the Florida Administrative Code requires." But Sunset Tours notes that Plaintiffs did not list any specific provision of the Code which its employees supposedly failed to discuss with Plaintiffs.

Plaintiffs contend, as an undisputed fact, that the WaveRunner was unseaworthy at the start of the tour and during the collision. They claim the PWC was wobbly, but Defendant objects to the unseaworthy claim and says the "fact" is very much in dispute. Referencing deposition testimony, Sunset Tours notes that the PWC was able to be used in tours following the collision with no difficulty and no harm to subsequent riders. The parties agree on the *definition* of "seaworthy": that the WaveRunner was "reasonably fit for its intended use." They also agree on the scope of a ship owner's duty and the Florida law which provides that "A livery may not knowingly lease, hire or rent a vessel to any person . . . [w]hen the vessel is not seaworthy." They also agree that Florida statutory law makes it a crime to rent an unseaworthy vessel to any person.

Plaintiffs say the undisputed facts show that Sunset Tours intended for Thornton to operate the WaveRunner with Fox as her passenger, but they do not cite any specific testimony or record evidence for this contention. In contrast, Sunset Tours notes that Fox, in her deposition, explained that she and her daughter, not Sunset Tours' employees, decided how they would ride and operate the PWC. In addition, defendant

notes that Lemon's deposition testimony confirmed that the riders decide how to place themselves on the WaveRunner, with little influence from Sunset Tours' employees.

The parties do not dispute that a warning placard was placed on the PWC console with its contents clearly visible to the rider. The placard contained the following warning, among others: "Do not operate the watercraft with any passengers on board until you have considerable practice and experience riding alone" and "obey all safety measures that follow this symbol [an exclamation point within a triangle] to avoid possible injury or death." But it is undisputed that Sunset Tours' employee knew that neither Thornton nor Fox had any experience operating PWCs.

The owner's manual warns that the WaveRunner is a "high performance boat" and advises operators to "ride within your limits." Although Plaintiffs contend that Thornton was "never provided access to the manual" and therefore "had no knowledge of these warnings," Thornton signed the Contract and Checklist, which contained warnings, information about hazards and diagram-assisted instructions on operating the PWC. For example, one section advises that the Wave Runner is a "high performance boat – it is not a toy" and instructs riders to "ride within your limits and avoid aggressive maneuvers." Sunset Tours therefore contends that these are "the same warnings and guidelines that are listed in the manual."

Defendant objects to paragraph 33 of Plaintiffs' undisputed facts, but this objection is, for all practical purposes, irrelevant because it does not actually dispute the

fact that it "could have" provided additional training or refused to rent the WaveRunner after assessing that Thornton had no experience but "chose not to do so." The objection is a legal argument, not an indication of a bona fide factual dispute.

On the other hand, Defendant does assert a legitimate factual dispute about Plaintiffs' contention that the undisputed facts show that there is no evidence demonstrating that Sunset Tours knew that Thornton would be able to operate the PWC, especially with her mother as a passenger on the back. Specifically, Sunset Tours notes that neither Plaintiff had any questions about the many instructions given to them and that this was an "indication of their understanding and comprehension of how to operate the PWC safely and correctly." Moreover, they note that Lemon pushed Plaintiffs off the dock but did not recognize any of the "red flags" usually seen when someone is uncomfortable with operating the PWC at the start of the tour. To the contrary, Lemon testified that Plaintiffs "looked perfectly fine" and appeared ready and comfortable to begin the tour aboard their rented PWC.

Plaintiffs contend that the Florida Fish and Wildlife Conservation Commission ("FWCC") rules provide that "persons offering a personal watercraft for lease, hire or rent shall conduct an on-the-water demonstration and check ride to verify the prospective operator's ability to safely operate the personal watercraft to be leased, hired, or rented." [ECF No. 41, p. 12]. Defendant objects to this allegedly undisputed fact (from paragraph 36 of Plaintiffs' list), but its objection relates to whether it violated

any FWCC rules and regulations. Paragraph 36 does not allege any violations; it merely explains the rule and notes that Plaintiffs' vessel was "shoved off [after a safety speech] and she was told to get underway north in the Salt Run Channel." [*Id.*]. Defendants do not challenge the explanation of the FWCC rule, nor do they challenge the other background facts listed in the paragraph.

Plaintiffs do, however, say (in paragraph 37) that Sunset Tours committed several violations of the FWCC rules: (1) the demonstration and verification are supposed to occur before the rental contract is executed and before the customer has paid for the rentals; (2) the words "NO REFUNDS" are printed in bold, capital letters, in a larger font, at the top and bottom of the rental agreement; (3) Defendant never had Thornton demonstrate her ability to operate the WaveRunner at cruising speeds in open water, never had her "perform turning and stopping movements" and never had her demonstrate an ability to turn the PWC to avoid a navigation hazard; and (4) it knew Thornton would be carrying her mother as a passenger but "took no action whatsoever to verify her ability to do so safely."

Sunset Tours objects to these allegedly undisputed facts listed in paragraph 37 of Plaintiffs' list. First, it contends that the Florida Administrative Code requires that a demonstration and check ride must be done -- but it does not specify that it must be done before payment has been made. Second, it contends that the initial run on the PWC is in fact the "check ride" discussed in the code after renters receive their

demonstration on how to operate the PWC. Third, it notes that the FWCC does not prohibit the words "NO REFUNDS" on a rental agreement. Fourth, it says that Sunset Tours does in fact authorize refunds if a customer insists on one. Fifth, it notes that refund policies are not addressed by the FWCC rules. Sixth, it contends that Plaintiffs "crashed during their check ride, which is used to assess each rider's ability to go full throttle, turn and avoid hazards, such as colliding with a mangrove."

Finally, in response to the allegation about not confirming that Thornton could operate the WaveRunner with her mother on the back, Sunset Tours repeats the point that Plaintiffs received a "laundry list of instructions and procedures" which were designed to "make sure that Carrie Thornton was knowledgeable in safely operating a PWC operation and be prepared to participate in the tour." It also reiterates Plaintiffs' failure to ask any questions after a Sunset Tours employee specifically asked if anyone had questions.

Sunset Tours contends that Thornton "lost control" of the WaveRunner while Plaintiffs say this is a contested issue of fact and note that Thornton "testified that she tried to turn the vessel to its left but that the vessel continued to turn right into the mangroves."

**Applicable Legal Standards and Analysis**

**The Summary Judgment Standard**

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted). If the movant establishes the absence of a genuine issue, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

For issues on which the opposing party will have the burden of proof at trial, the movant can prevail by merely pointing out that there is an absence of evidence to support the non-movant's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "By its very terms, this standard provides that the mere existence of *som*e alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant

or unnecessary will not be counted." *Id.* at 248. Likewise, a dispute about a material fact is a "genuine" issue only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

An issue of fact is "'genuine' if the record taken as a whole could lead a rational tier of fact to find for the nonmoving party." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the summary judgment motion.

Nevertheless, the non-movant cannot defeat summary judgment by: (a) "rest[ing] upon mere allegations or denials," *Woolsey v. Town of Hillsboro Beach*, 541 F. App'x 917, 919 (11th Cir. 2013); (b) "simply *saying* the facts are in dispute," *Latele Television, C.A. v. Telemundo Commc'ns Grp., LLC*, No. 12-22539, 2014 WL 7272974, *7 (S.D. Fla. Dec. 18, 2014); or (c) relying on "evidence that is merely colorable or not significantly probative," *Fields v. Gorman*, No. 09-61466, 2010 WL 3769396, *3 (S.D. Fla. Sept. 3, 2010). "Rhetoric and attorney argument are no substitute for record evidence." *Latele*, 2014 WL 7272974, at *7.

To the contrary, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported summary judgment motion. *Anderson*, 477 U.S. at 252. Indeed, "Rule 56 mandates the entry of summary judgment, upon motion, against a party who fails to make a showing sufficient to establish an element essential to his

case on which he bears the burden of proof at trial." *Schechter v. Ga. State Univ.*, 341 F.

App'x 560, 562 (11th Cir. 2009). A mere "scintilla" of evidence in favor of the non-

moving party, or evidence that is merely colorable or not significantly probative is not

enough to defeat a properly supported summary judgment motion. *Id.; see also Mayfield*

*v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations and

conjecture cannot be the basis for denying summary judgment).

Plaintiffs allege that Sunset Tours and/or its employees/agents negligently

failed to provide Plaintiffs with adequate education and training necessary for

the safe operation of the rented PWC at the time of the accident in violation of

Florida Statute § 327.54. Florida Statute § 327.54 states in part:

> (1) A livery may not knowingly lease, hire, or rent a vessel to any
> person: . . .
>
> (e) When the vessel is equipped with a motor of 10 horsepower[1] or
> greater, unless the livery provides prerental or preride instruction
> that includes, but need not be limited to:
>
>> 1. Operational characteristics of the vessel to be rented.
>>
>> 2. Safe vessel operation and vessel right-of-way.
>>
>> 3. The responsibility of the vessel operator for the safe and
>>    proper operation of the vessel.
>>
>> 4. Local characteristics of the waterway where the vessel will be
>>    operated.

---

[1]     Sunset Tours concedes that the WaveRunner at issue was equipped with a motor
of 10 horsepower or more. [ECF No. 52-1, p. 9].

(4)(b) A livery may not knowingly lease, hire, or rent a personal watercraft to any person who has not received instruction in the safe handling of personal watercraft, in compliance with rules established by the commission pursuant to chapter 120.

(c) Any person receiving instruction in the safe handling of personal watercraft pursuant to a program established by rule of the commission must provide the livery with a written statement attesting to the same.

Because Sunset Tours focuses on the release language and both sides urge contrary views on whether § 327.54 was followed, it is appropriate to discuss how the general rule governing releases is modified when a violation of a safety statute is involved in the case. This precise issue was addressed in *Tassinari v. Key West Water Tours, L.C.*, No. 06-10116, 2007 WL 1879172 (S.D. Fla. June 27, 2007), another personal injury case involving PWCs rented in Key West, Florida. In that case, two watercraft operated by different renters collided, injuring the two plaintiffs. Similar to the claims and defenses raised in the instant case, the defendant in *Tassinari* sought summary judgment because, among other reasons, the plaintiffs signed a waiver and hold-harmless agreement (i.e., a release) contained in the rental agreement -- while the plaintiffs sought summary judgment (and argued against defendant's summary judgment motion) because the defendant PWC tour operator violated certain Florida safety statutes, making it negligent per se.

Significantly, the safety statutes at issue in *Tassinari* were also Florida Statutes §§ 327.54 and 327.39[2], which the Court there described as "enacted to protect boater safety, including the prevention of collisions" and to "protect the safety of renters of watercraft," which means that PWC renters "are among the class of persons intended to be protected by the statutes." 2007 WL 1879172, at *3.

In *Tassinari*, it was undisputed that the tour guide who provided the safety instruction never completed the required boater's safety course and the tour company did not require its tour guide employees to have passed such a course. Consequently, it was clear that the defendant there violated the Florida statutes designed to protect boater safety and prevent collisions.

The *Tassinari* Court noted that the federal maritime law's unique version of negligence per se is embodied in what is sometimes called the "Pennsylvania Rule." *Id.* (citing *Superior Const. Co., Inc. v. Brock*, 445 F.3d 1334, 1340 (11th Cir. 2006)). As explained by the Eleventh Circuit in *Superior Construction* (and as referenced in *Tassinari*), "[u]nder the Pennsylvania Rule, when a ship at the time of an allision[3] is in

---

[2]    Florida Statute § 327.39, entitled "personal watercraft regulated," provides, in pertinent part, in subsection (6)(b)(1), that "it is unlawful for the owner of any leased, hired, or rented personal watercraft, or any person having charge over or control of a leased, hired, or rented personal watercraft, to authorize or knowingly permit the watercraft to be operated by any person who has not received instruction in the safe handling of personal watercraft, in compliance with rules established by the commission."

[3]    An allision is a collision between a moving vessel and a stationary object.

actual violation of a statutory rule intended to prevent allisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster and in such a case the burden rests upon the ship of showing not merely that her fault might not have been of the causes, or that it probably was not, but that it could not have been." *Id.* (citing *The Pennsylvania,* 19 Wall. 125, 86 U.S. 125 (1873)).

The *Tassinari* Court then noted that a waiver/release is unenforceable on public policy grounds "if the agreement would exempt a party from liability arising from that party's failure to comply with a safety statute, as the safety obligation created by the statute for such purpose is an obligation owed to the public at large and is not within the power of any private individual to waive." *Id.* at *5. The Court held that the release and waiver provisions in the PWC rental contracts "are sufficient to release Defendant from liability for *ordinary* negligence," they are "invalid as against public policy when applied to liability arising from violation" of the safety statutes at issue in both cases. *Id.*[4] The Court therefore denied the PWC tour operator's summary judgment motion.[5]

---

[4]   *See generally Cooper v. Meridian Yachts, Ltd.,* 575 F.3d 1151, 1166-1168 (11th Cir. 2009) (summarizing Florida contract law which holds that exculpatory provisions attempting to relieve a party of his or her own negligence are enforceable where the intention is made clear and unequivocal with contractual wording so clear and understandable "that an ordinary and knowledgeable party will know what he is contracting away"); *In re Royal Caribbean Cruises, Ltd.,* 459 F. Supp. 2d 1275, 1278-79 (S.D. Fla. 2006) (enforcing release for injuries arising from use of WaveRunner owned by cruise ship operator).

Unlike the factual scenario in *Tassinari,* it is far from clear whether any of Defendant's employees violated the applicable safety statute.

Plaintiffs suggest that Coleman never took the required boater safety course because neither he nor Sunset Tours ever presented the card, but Coleman's testimony on this point is unrebutted -- he testified that he took and completed the course but no longer has the card. Plaintiffs can **argue** or suggest that the missing card somehow means that Coleman did not actually take the course, but rhetoric alone is insufficient to generate a factual dispute. There is no *evidence* that Coleman had not taken an acceptable boater safety course. In fact, the only record evidence is to the contrary.

The mere fact that Coleman no longer has the card may generate a suspicion, but that is inadequate to generate a bona fide dispute about a material fact. Plaintiffs may want to cross-examine Coleman about the missing card in front of a jury, but that, too, is inadequate to create a factual dispute. In order for credibility to be an issue for a jury, there needs to be an actual **conflict** in the record evidence. There is no conflict here -- only record *evidence* supporting Defendants' position about Coleman's training and a *hunch* that the missing card somehow means that his testimony is not credible.

---

[5]     In addition, because it was undisputed that the defendant violated the safety statute due to its employee's failure to complete the required boater safety course, the Court also granted the plaintiffs' summary judgment motion. The Court later denied [ECF No. 76, Case 06-cv-10116-KMM] the defendant's Motion for Reconsideration and no appeal was pursued.

If a party could avoid summary judgment by merely *saying* that a jury could always choose to disbelieve the record evidence submitted by the movant, then no summary judgment would ever be entered because that argument could be made in every case. *Matsushita Elec. Indus,* 475 U.S. at 586 (the summary judgment opponent "must do more than simply show there is some metaphysical doubt as to the material facts"); *Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008) (affirming summary judgment for defendants in 1983 civil rights suit against school district for alleged illegal retaliation  for parents' complaints about high school softball coach and explaining that "when challenges to witness' credibility are *all* that a plaintiff relies on, and he has shown no independent facts – no proof – to support his claims, summary judgment in favor of the defendant is proper"). *See also Dugan v. Smerwick Sewerage Co.,* 142 F.3d 398, 406 (7th Cir. 1998) (the "prospect of challenging a witness' credibility is not alone enough to avoid summary judgment"); *Fontanez v. Lamberti,* No. 10-61428-CIV, 2011 WL 4499016, *2, n.3 (S.D. Fla. Sept. 27, 2011) (rejecting Plaintiffs' unstated argument that detective was lying because there was no evidence to support the theory).

But the Undersigned cannot with confidence conclude that there is no factual dispute about whether the WaveRunner was seaworthy. Plaintiffs submitted evidence that the WaveRunner was wobbly, and this is evidence to support the claim that the PWC was not seaworthy. To be sure, there is substantial contrary evidence (e.g., that the WaveRunner was driven back to the dock and then used again without incident), but it

is not the Court's place to weigh the testimony that the PWC wobbled against the Defendant's evidence and make a fact-based determination on summary judgment about whether this particular WaveRunner was seaworthy when turned over to Plaintiffs.

There is also a genuine factual dispute about the sufficiency of the pre-ride instructions given to Plaintiffs. If the instructions were insufficient, then the safety statutes were violated and it is incumbent on Defendant to prove that its employees' actions "could not have been" the cause of the loss. In addition, violation of the safety statute would also mean that the release/waiver is ineffective.

The statute and rule require that Sunset Tours provide "prerental or preride instruction" on certain topics, and a jury could conclude that posting a placard on the WaveRunner's window is not **instruction** or, if it is, it is inadequate. Sunset Tours contends that some of its compliance was generated through the placard, but it is up to the factfinder to determine whether a card constitutes sufficient instruction.

Moreover, there is a factual question concerning the demonstration and check ride.

FAC 68D-36.107(3) provides that "[p]ersons offering a personal watercraft for lease, hire or rent shall conduct an on-the-water demonstration and check ride to verify the prospective operator's ability to safety operate the personal watercraft to be leased, hired, or rented." Based on the factual disputes listed above, determining whether

22

Sunset Tours conducted a sufficient demonstration and check ride is not an issue to be resolved on summary judgment.

For example, FAC 68D-36.107(3) requires Sunset Tours to conduct the on-the-water demonstration and check ride "to verify the prospective operator's ability to safely operate" the WaveRunner. Although the parties have not directed the Undersigned to a statute, rule or case which would prevent a livery from renting a PWC to a novice like Thornton, the jury would certainly be entitled to conclude that Sunset Tours did not conduct an adequate verification before allowing rookie Plaintiffs to leave and before instructing Thornton to provide significant acceleration on the gas. Because the rule uses the word "prospective," a jury would be permitted to conclude that the demonstration, check ride and verification of ability occur before the renter engages in any significant activity aboard the PWC.

To be sure, a jury could conclude that the instructions, training, demonstration and check ride *were s*ufficient to comply with the statute and the rule. But a jury could also conclude otherwise. The jury might conclude that there was no on-the-water demonstration before Plaintiffs were permitted to venture out down the channel on their own. The jury might conclude that the check ride should have been conducted *before* the mother and daughter plaintiffs were allowed to venture out at full throttle. The jury could conclude that the check ride should not be the actual beginning of the tour, when renters are heading down the channel. The jury could conclude that Sunset

Tours' verification was inadequate because it did not determine whether Thornton could turn the PWC or slow it down sufficiently to avoid hazards. Or the jury could find that Sunset Tours fully complied with the statute and the rule.

Given this permissible dichotomy, "[t]he contradiction [between the permissible interpretations of the facts, as well as a dispute over some factual contentions] presents a classic swearing match, which is the stuff of which jury trials are made." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (affirming on interlocutory appeal an order denying police officers' summary judgment motion based on alleged qualified immunity). *See generally* Restatement (Second) of Contracts § 195, comment a (1981).

The Court understands that both Plaintiffs and Defendant *say* that there are no genuine issues of material fact which would preclude the Court from granting summary judgment in their favor. But there *are* in fact disputes, and neither party is entitled to summary judgment on the fact-intensive question of whether Sunset Tours complied with the safety statutes and regulations. Because that question also implicates the effectiveness of the release, the Undersigned cannot on summary judgment rule that the release is valid and precludes all claims here.

In the classic words (albeit musical ones) of Willie Nelson from his <u>Two Sides to Every Story</u> song,[6] "there must be two sides to every story / And who's to say who is

---

[6]      From the "Honeysuckle Rose" album (Columbia 1980).

right and who is wrong." Willie Nelson might not know who should decide which party is right and which party is wrong, but the Undersigned knows, at least in this case, based on this record: the jury.[7]

## Conclusion

The Undersigned, being a music fan who enjoys Willie Nelson, **denies** both summary judgment motions.

**DONE and ORDERED** in Chambers, in Miami, Florida, August 9, 2016.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

---

[7]     The *In Re Royal Caribbean Cruises Ltd.* Court, 459 F. Supp. 2d 1275, enforced the release in a case involving a WaveRunner that crashed into an island even though the plaintiffs argued that the release was unenforceable due to the defendant cruise ship operator's failure to comply with the safety rules outlined in the release (because the tour leader allegedly directed one of the plaintiffs to violate the safety rules listed in the release). Significantly, the Court explained that the plaintiffs did not present any case law or other authority to support their view about the purported unenforceability of the release.  Consequently, the Court did not mention the "Pennsylvania Rule" or *Tassinari.*

Moreover, that case involved a **plaintiff** who violated a safety rule he agreed to follow, and no such scenario was involved in the instant case. The Court found this fact significant, explaining that (1) the plaintiff "chose to violate the rule," (2) it would be "unfair and inequitable" to allow the plaintiff "to avoid the clearly defined and unambiguous terms of the release based upon is contention that the tour group leader allegedly directed him to violate the safety rules outlined in the Release," (3) the plaintiff "is an adult who was or at least should have been aware of the safety rules to which he agreed," (4) "as an adult," the plaintiff "had the responsibility to comply with those rules for his safety," and (5) "after voluntarily violating this rule," the plaintiff "cannot cast blame for his actions" upon the cruise ship operator.

<u>Copies furnished to</u>:
All Counsel of Record